**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL HALDORSON,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 1063** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

After a trial, a jury convicted Michael Haldorson of distribution of cocaine, possession of cocaine with intent to distribute, and possession of an explosive during the commission of a felony. The Court sentenced him to a 16-year prison term, followed by five years of supervised release. Haldorson has filed a *pro se* motion under 28 U.S.C. § 2255, asserting eleven grounds for relief including several violations of his right to counsel. For the reasons stated below, the Court denies the motion.

### Background

**A.      Investigation and arrest**

The investigation into Haldorson began in April or May 2015. Thomas Insley, a patrol officer with the Village of Rockdale Police Department and a member of the Will County Cooperative Police Assistance Team (CPAT), learned from a confidential informant (CI) that an individual known as "Mike Jones" was selling cocaine. The CPAT is a collective of officers from local police departments who conduct narcotics

investigations, control informants, and go undercover.  The informant provided Insley

with a picture of Mike Jones's vehicle (with a license plate reading "MKJNZ") and his

phone number.  After running the vehicle's plate through a law enforcement database,

Insley learned that the vehicle was registered to Haldorson.  Insley showed the

informant a picture of Haldorson, who the informant identified as Mike Jones.

Insley and the CI set up a controlled purchase of cocaine from Haldorson on

June 1, 2015.  Insley provided the CI with money to make the purchase, outfitted the CI

with an audio transmitter and recorder, and set up a visual surveillance team comprising

other CPAT officers.  The CI met Haldorson in a Walmart parking lot in Joliet, Illinois,

where Insley was parked in a nearby space.  When Haldorson pulled into the lot, the CI

got into Haldorson's vehicle and bought 1.7 grams of cocaine from him.

After the transaction was completed, Insley followed the CI to a prearranged

location and retrieved the purchased drugs.  The surveillance team followed

Haldorson's car, but they did not stop or arrest him at the time.  They eventually lost

sight of the car when they were stopped at a red light.

About three weeks later, Insley and the CI set up another drug deal with

Haldorson.  This time, however, Insley planned to stop and arrest Haldorson on his way

to the deal.  Insley arranged for a Plainfield police officer to pull Haldorson over near the

meeting point.  Following the stop, the Plainfield officer made up excuses to buy time

until CPAT officers could arrive on scene and take over.  The CPAT officers arrested

Haldorson and transported him to the Plainfield Police Department.  They also drove

Haldorson's vehicle to the police department and searched it, finding drugs, fireworks,

and suspected pipe bombs.

**B.      Search of Haldorson's apartment and storage garages**

After discovering the suspected pipe bombs in Haldorson's car, the CPAT called in agents from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) who removed the explosives from the vehicle and rendered them safe. The officers were concerned that Haldorson had other explosive materials stored in his home and attempted to locate his place of residence. Haldorson initially told the officers that he was homeless but later stated that he lived in Joliet at his parents' house.

CPAT officers and ATF agents went to the Joliet address at around 2:45 a.m. on June 24, 2015. Haldorson's parents consented to a search of Haldorson's room, in which the officers found narcotics-related items but no explosives. Haldorson's parents told the officers that Haldorson actually lived in Plainfield with a woman. Although his father did not know the exact address, he gave the officers a general description of the area and apartment.

The officers went to the location and eventually found the apartment. Haldorson's roommate, Allyson Figas, answered the door. She confirmed that Haldorson lived there and gave consent to search the common areas of the apartment. The officers also searched Haldorson's bedroom, using the keys that were taken from Haldorson during his arrest to open the locked door. The officers first conducted a "plain view" search for explosives, which resulted in the discovery of fireworks and explosives. The officers then stopped their search and applied for a search warrant for the apartment. After they received the search warrant, they conducted an additional search of the bedroom, which resulted in the seizure of narcotics-related items and two laptop computers.

Later that day, the officers went to Haldorson's storage garages, which were located within the gates of an apartment complex in Crest Hill, Illinois where he had resided. The officers walked back and forth in front of the garages with a drug-sniffing police dog. The dog alerted between garages 49 and 50. Using this information, the officers applied for a search warrant to search the garages. After receiving the warrant, they conducted a full search of the garages, recovering PVC piping, explosive powder canisters, fireworks, a handgun, and ammunition.

**C.    Pre-trial hearings**

Haldorson was indicted on seven counts: (1) distribution of cocaine; (2) possession of cocaine with intent to distribute; (3) possession of MDMA and cocaine; (4) possession of an explosive during the commission of a felony; (5) possession of a destructive device; (6) possession of an explosive following a felony conviction; and (7) possession of a firearm following conviction of a felony.

Haldorson's attorneys filed several motions to suppress, seeking to exclude from evidence the recording of Haldorson's conversation with the CI on June 1, 2015; the evidence obtained as a result of his detention and arrest; his statements to law enforcement after his arrest; and the evidence obtained through the consent searches and search warrant executions. The Court held evidentiary hearings on the motions and later made an oral ruling denying the motions.

The Court also held hearings to address various motions *in limine*. The parties addressed, among others, challenges to photographic evidence from Haldorson's laptop; the scope of the defense's cross-examination of witnesses relating to the June 1, 2015 recording; and the details of Haldorson's prior convictions that could be

4

introduced. The Court deferred ruling on the issues but noted that it was disinclined to allow the government to introduce the nature of his prior convictions. Instead, it stated that the government "would be able to put in at most that [Haldorson] was convicted of . . . two felonies in May of 2008." Jan. 24, 2018 Hr'g Tr. at 25–26.

## D. Trial

Haldorson's trial started in January 2018. On the fifth day of trial, Haldorson's attorney informed the Court that Haldorson was not intending to testify. When the Court asked Haldorson to verify this information, Haldorson requested additional time to discuss the issue with his attorney. The Court gave them ten minutes to confer, after which Haldorson stated that he was not going to testify. The Court and Haldorson then engaged in the following conversation:

> THE DEFENDANT:  I'm not going to testify.
>
> THE COURT:  All right.  And this is your decision, right?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Nobody has told you can't testify?
>
> THE DEFENDANT:  No.
>
> THE COURT:  Nobody is preventing you from testifying?
>
> THE DEFENDANT:  No.
>
> THE COURT:  Nobody's threatened you or anything like that?
>
> THE DEFENDANT:  No.
>
> THE COURT:  Okay.  All right.  And so this is your own decision made of your own free will; is that right?
>
> THE DEFENDANT:  Yes.

Trial Tr. at 998.

The jury found Haldorson guilty on counts 1 through 4.  They acquitted him of counts 5 and 7, which were charges of possession of a destructive device and possession of a firearm following conviction of a felony.  Earlier in the trial, the government dropped count 6, which charged Haldorson with possession of an explosive following conviction of a felony.  The Court later vacated the conviction on count 3 on the ground that it was a lesser-included offense of counts 1 and 2.

Haldorson's sentencing hearing was held in May 2018. The Court sentenced him to a 16-year prison term, followed by five years of supervised release.  Specifically, the Court sentenced him to 72 months on each of the drug charges, to run concurrently, and 120 months for carrying an explosive during a felony, consecutive to the sentence imposed for the other charges.  The Court imposed a five-year term of supervised release on each count, with each of these terms running concurrently.

**E.     Appeal**

Haldorson raised three issues on appeal.  First, he argued that the Court erred in denying the motions to suppress the evidence seized from his car and his apartment. Second, he argued that the jury instructions constructively amended count 4 of the indictment.  And third, he contended that he did not receive a fair trial because of mistakes and errors made during the law enforcement investigation that led to the indictment.  The Seventh Circuit overruled each of Haldorson's arguments and affirmed the Court's judgment in all respects.  *United States v. Haldorson*, 941 F.3d 284 (7th Cir. 2019).

## Discussion

Under 28 U.S.C. § 2255, a court may vacate, set aside, or correct a sentence imposed in violation of the laws of the United States.  The majority of Haldorson's claims involve contentions that he was denied his Sixth Amendment right to effective assistance of counsel.  To prevail on such a claim, he must meet the two-part test outlined by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  He must show that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) this deficient conduct caused him to suffer prejudice.  *Id.* at 687–88.  To show prejudice, the movant must show that "there is a reasonable probability that but for his counsel's errors, the outcome of the proceeding would have been different."  *Shannon v. Hepp*, 27 F.4th 1258, 1268 (7th Cir. 2022).

### A.     Ground 1

Haldorson argues that his attorneys were ineffective because they failed to consult with and call to testify three different kinds of experts.

#### 1.     Expert on police procedures

Haldorson contends that his attorneys should have consulted with an expert on police procedures, but he does not provide any explanation of how the proposed expert testimony would have made a difference in the outcome of the case.  For this reason, the Court denies the claim.  *See United States v. Hatterman*, 853 F.2d 555, 559–60 (7th Cir. 1988) (holding that defense counsel's failure to present expert testimony did not prejudice the defendant).

#### 2.     Expert on pyrotechnics

Haldorson argues that testimony from a pyrotechnics expert was necessary to

show the jury that the items seized from him were fireworks rather than pipe bombs. The problem with his argument is that the jury's decision regarding the convicted charges did not depend on whether the items in his car were bombs or fireworks. Counts 1 and 2 were drug offenses, and count 4 only required that Haldorson carried "an explosive, *namely smokeless powder*, during the commission of that crime," not a pipe bomb in particular.  *United States v. Haldorson,* No. 15 CR 623, dkt. no. 331 at 18 [hereinafter CR] (emphasis added); *see also* 18 U.S.C. § 844(j) (defining explosive as including "smokeless powders").  It was on the basis of the smokeless powder found *inside* Haldorson's claimed fireworks that the government urged the jury to convict Haldorson on count 4.  *See, e.g.*, Trial Tr. at 1078 (stating that counts 4 and 5 "relate to the pipe bombs and the powders inside of those pipe bombs"); *id.* at 1094 ("Count Four charges the defendant with carrying an explosive, namely, smokeless powder, an explosive you heard was inside of these three pipe bombs, all found in defendant's car on June 23rd, 2015").  Because testimony from a pyrotechnics expert would have been immaterial to the question of whether Haldorson carried smokeless powder during the commission of a felony, it was not ineffective assistance of counsel for his attorneys to fail to present such evidence.  *See Rogers v. Israel*, 746 F.2d 1288, 1292 (7th Cir. 1984) ("In deciding whether a defense counsel's failure to investigate expert opinions was prejudicial, courts have considered whether such opinions were critical to the presentation of a defense.").

   3.    **Expert on cell phones and data extraction**

As with his claim regarding the police procedures expert, Haldorson provides no explanation of how expert testimony from an expert on cell phones and data extraction

would have made a difference in the outcome of the case.  The Court thus overrules this claim.

**B.     Ground 2**

Haldorson argues that his attorneys were ineffective because they failed to interview and call several witnesses whose testimony, he contends, would have made a difference in the outcome of the case.

**1.     Raymond Haldorson**

Haldorson contends that his father Raymond Haldorson would have testified that he did not know where Haldorson was living on June 23, 2015 when the officers visited the house in Joliet, thus contradicting the testimony of the officers at trial and at the suppression hearings.

It is clear, however, that this testimony would not have changed the outcome of either the suppression hearing or the trial.  First, it is not entirely clear that the proposed testimony would have, in fact, contradicted the testimony of the officers at the suppression hearing.  Haldorson's father contends that he told the officers that Haldorson lived with a woman in Plainfield but that he did not tell them Haldorson's exact address.  But the government's witnesses did not contend that Haldorson's father told them Haldorson's exact address.  Rather, one witness testified that the officers "had a description of the address from Mr. Haldorson's father" and that they went to this general area and knocked on doors until they found the apartment.  Sept. 15, 2017 Hr'g Tr. at 50.  Another officer acknowledged that Haldorson's father "couldn't pinpoint exactly which [apartment] it was."  Oct. 4, 2017 Hr'g Tr. at 18.  There is nothing inherently inconsistent between the officers' testimony and Haldorson's father's

proposed testimony.

Even if the proposed testimony did contradict the officers' testimony, the evidence would have been cumulative of other impeachment evidence that Haldorson presented at the suppression hearing. Haldorson had attempted to undermine the credibility of the government's witnesses by pointing out inconsistencies in the officers' statements. The Court noted these "irregularities" in its oral decision. CR dkt. no. 396 at 2–3. Despite recognizing these inconsistencies, the Court still found that the testimony from the government's witnesses were sufficiently credible to conclude in favor of the government. For this reason, Haldorson has failed to meet his burden of showing a reasonable probability that the outcome of the suppression hearing would have been different.

Similarly, Haldorson has not shown that there is a reasonable probability that his father's testimony would have changed the outcome of the trial. First, the proposed testimony does not directly contradict the officers' testimony at trial, meaning that it is unlikely to have undermined the credibility of the government's witnesses. *See, e.g.,* Trial Tr. at 928 ("He did not know the exact address."). Additionally, as at the suppression hearing, Haldorson presented significant evidence attacking the credibility of the officers' testimony, and there is no reason to think that any additional impeachment evidence would have led to a different outcome.

### 2.    Andrea D'Andrea

Haldorson contends that his attorneys rendered ineffective assistance by failing to interview Andrea D'Andrea and call her to testify at trial. He contends that D'Andrea would have provided evidence that the CI had an improper motive for setting Haldorson

up; specifically, he contends that D'Andrea would have testified that the CI told her that he wanted to get even with Haldorson.

The absence of this testimony, however, did not prejudice Haldorson. The trial did not turn on the believability of the CI, as he did not testify, and all that came from him were his contemporaneously recorded statements in speaking with Haldorson. The latter did not put the CI's credibility at issue either, as they were introduced not for their truth but rather to provide context for Haldorson's statements and the evidence about what he did during his transaction with the CI. Under the circumstances, testimony concerning any alleged improper motive on the part of the CI would not have been relevant or admissible at trial. *See United States v. Silva*, 71 F.3d 667, 670–71 (7th Cir. 1995) (holding that evidence to impeach a witness was not admissible where "[n]one of the prosecution's evidence depended in any way upon the veracity of his information").

    **3.**    **Roland Chabolla, Khaliah Williams, Nicole Ormsby, Ashley Gritsuk, and Lisa Haldorson**

Haldorson also contends that it was ineffective assistance of counsel for his attorneys to fail to interview and call several witnesses who he says could have testified regarding his past fireworks displays. As the Court has explained, whether the items seized were fireworks or pipe bombs is irrelevant because one way or another, they contained smokeless powder, an explosive under the relevant statute. Haldorson offers nothing to suggest that the testimony of any of these witnesses would have contradicted this testimony in any way, shape, or form. For this reason, Haldorson was not prejudiced by his attorneys' claimed failure to interview and call these witnesses.

### 4.    Allyson Figas

Haldorson argues that his attorneys rendered ineffective assistance by failing to interview and call Allyson Figas to testify about the searches of the Plainfield apartment. He states in an affidavit:  "Allyson Figas would have testified that she was asleep on the couch and that she awoke to officers standing over her in the living room, that officers threatened to charge her with anything found in the apartment unless she signed a consent form to search . . . ."  Sec. 2255 Mot. at 136.  This testimony, he contends, would have contradicted the officers' testimony that the search of the apartment was consensual and thus would have changed the Court's decision on his motion to suppress.

A section 2255 movant claiming ineffective assistance for failure to call a witness bears the burden to provide sufficient information about the witness's anticipated testimony to demonstrate that it would have made a difference.  *See United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011).  To meet this burden, the movant typically must provide testimony or an affidavit from the potential witness herself.  *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991).  "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Id.*

Haldorson does not meet this burden.  He does not provide an affidavit or testimony from Figas, and his only evidence of what Figas's testimony would have been is his own affidavit.  That is not enough.  The Court overrules this claim.

### 5.    Kristyn Morrill

Lastly, Haldorson argues that he received ineffective assistance when his

attorneys failed to interview and call Kristyn Morrill to testify that she owned the firearm found in the garage. The problem with this argument, however, is that Haldorson was acquitted of the firearm charge. And there is no viable basis to believe that the mere presence of these charges impacted the jury's verdict on the charges on which they convicted Haldorson. The jury was instructed to consider each charge separately, CR dkt. no. 331 at 14, and it is presumed to have followed this instruction. *Perry v. McCaughtry*, 308 F.3d 682, 690 (7th Cir. 2002) (stating that courts "presume that juries follow instructions"). Thus even if his attorneys' conduct was deficient, he was not prejudiced by the deficiency.

**C.      Ground 3**

Haldorson argues that his attorneys' failure to file a motion to suppress the June 1, 2015 recording of his conversation with the CI constitutes ineffective assistance of counsel. The Court disagrees.

First, it is not true that Haldorson's attorneys did not file a motion challenging the June 1, 2015 recording. One of his attorneys, Elizabeth Johnson, filed a motion to suppress the recording on April 7, 2016. *See* CR dkt. no. 80. In the motion, Johnson argued that the recording was made in violation of the Illinois Eavesdropping statute— the very same argument that Haldorson now contends that his attorneys should have made. *Id.* at 3; *see also* CR dkt. no. 81. The Court denied the motion. *See* CR dkt. no. 133.

Second, even if his attorneys had not moved to suppress or bar the recording, Haldorson's claim regarding their failure to do so would fail because the motion would have lacked merit. *See United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004).

Use of a recording made in violation of the Illinois Eavesdropping Act does not constitute a violation of a defendant's federal constitutional rights.  This has been established law in this circuit since 1969, when the Seventh Circuit rejected the defendant's argument that "the Illinois Eavesdropping Act . . . precludes the admission of [the contested] evidence in a federal trial."  *United States v. Teller*, 412 F.2d 374, 377 (7th Cir. 1969).

**D.    Ground 4**

Haldorson argues that his attorneys' failure to file a motion to suppress the evidence obtained from the garage constitutes ineffective assistance of counsel.  This claim lacks merit, for two reasons.

First, Haldorson was not prejudiced by this claimed error.  The storage garage contained canisters of smokeless powder, PVC pipes, fuses, fireworks, and a digital scale.  Even if this evidence had been excluded, there is no reasonable probability that the outcome of the proceeding would have been different, given the overwhelming amount of other evidence establishing Haldorson's guilt.  The most important evidence in the case included the recording of Haldorson selling cocaine to the CI, the narcotics that were recovered from the transaction with the CI, the narcotics and smokeless powder recovered from Haldorson's car, and his admissions that the items in the car belonged to him.  None of these crucial pieces of evidence were obtained from his garage.  Thus, regardless of whether Haldorson's attorneys moved to suppress the evidence from the garage, the outcome of the proceeding would not likely have been different.

Second, Haldorson's claim fails because his proposed motion would not have

14

been meritorious. *See Stewart*, 388 F.3d at 1084 (holding that defense counsel was not ineffective because the proposed motion would not have been meritorious). He offers two grounds that he contends would have supported suppression of the garage evidence. The first is that the search warrant for the garage was invalid because the officers misrepresented certain facts when applying for the warrant. The second is that the search warrant was invalid because it was based on information received from a warrantless police dog sniff search of the garage.

On the first point, Haldorson argues that his attorneys should have requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), regarding the search warrant for the garage, based on inconsistencies between the police report and the warrant application. Specifically, he points out that according to the investigating officer's report, Figas stated that she was at the garage "within the last month," but the search warrant stated that Figas made her observations "within the last two weeks." Sec. 2255 Mot. at 95.

This claimed "inconsistency" is not enough to overturn the warrant. *Id.* To be entitled to a *Franks* hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *United States v. Slizewski*, 809 F.3d 382, 384 (7th Cir. 2016). Haldorson does not make a substantial showing of the requisite mental state. He provides no evidentiary basis for his contention that the officer intentionally misrepresented Figas's statement on the search warrant application. *See United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009) ("Conclusory, self-serving statements are not enough to obtain a *Franks* hearing.").

15

This is particularly true given the fact that the officer who wrote the investigation report was not the same officer who wrote the search warrant application, and there is no evidence that the officer who wrote the search warrant application relied on the other officer's report in recounting Figas's statement. Without more, there is not enough here to think that any misrepresentation was intentional or reckless, as opposed to a mistake.

On the second point, Haldorson argues that the garage evidence should have been suppressed as fruit of the officers' warrantless dog sniff search of the garage. He compares the case to *Florida v. Jardines*, 569 U.S. 1 (2013), in which the Supreme Court held that a warrantless police dog sniff violated the defendant's Fourth Amendment rights. The government argues that *Jardines* does not apply here because the sniff in this case occurred in an area where the police were lawfully present. It cites *United States v. Brock*, 417 F.3d 692, 697 (7th Cir. 2005) and other pre-*Jardines* cases for support.

After *Jardines*, however, *Brock* and the other cases the government cites are no longer good law in this or any other circuit. The Seventh Circuit recognized this in *United States v. Gutierrez*, 760 F.3d 750, 755–56 (7th Cir. 2014), when it stated that "*Brock* is no longer good law." Nevertheless, the Court ultimately agrees with the government: the warrantless dog sniff of Haldorson's garage did not violate his Fourth Amendment rights.

The Supreme Court has articulated two theories concerning individuals' Fourth Amendment rights. The first "focuse[s] on the common law of property and whether the police committed a trespass when conducting the search." *United States v. Sweeney*, 821 F.3d 893, 899 (7th Cir. 2016). "Under this approach, where the government has

'physically occupied private property for the purpose of obtaining information,' its intrusion is a search subject to the Fourth Amendment." *Id.* (quoting *United States v. Jones*, 565 U.S. 400, 404 (2012)).  But not all government trespasses are violations of the Fourth Amendment.  *Id.* at 900.  Rather, only trespasses of constitutionally protected areas, like a home or its curtilage, are violations.  *Id.*

Haldorson cannot show a violation of his Fourth Amendment rights under the trespass theory because the officers did not trespass upon a constitutionally protected area.  Haldorson contends that the area in front of his garages, like the front porch in *Jardines*, constituted the curtilage of his home.  The Court disagrees.

To determine the scope of curtilage, courts look to the factors enumerated in the Supreme Court's decision in *United States v. Dunn*, 480 U.S. 294, 301 (1987).  These factors are (1) the proximity of the area to the home; (2) whether the area is in an enclosure surrounding the home; (3) the defendant's use of the area; and (4) whether steps have been taken to protect the area from observation.  *Id.*  The first factor, proximity to the home, weighs against Haldorson's position.  The garages and the area in front of them were not close to his apartment but rather were detached and in the parking lot of the apartment complex.  Dkt. no. 6 at 172.

The second factor asks whether the area is in an enclosure surrounding the home.  This also weighs against Haldorson's position.  The garages and area in front of the garages were not in an enclosure surrounding his apartment.  Although Haldorson notes that the apartment complex is a gated complex, this fact is immaterial for purposes of the curtilage analysis.  The question is whether the area was "enclosed and intimate to" his *specific* apartment, and he does not dispute that there is no enclosure

17

around only his apartment and the garages.  *See Sweeney*, 821 F.3d at 901.

Next, the Court looks to Haldorson's use of the area.  Haldorson did not use the area in front of his garages for activities "intimately linked" to his home.  *Id.*  The area served only as a common space within the shared parking lot of his apartment complex where residents could walk around and access their individual storage garages.  This factor thus weighs against Haldorson's position as well.

The last factor asks whether steps had been taken to protect the area from observation.  The Court finds that there were none.  Although one could reasonably argue that Haldorson had taken steps to protect the *inside* of his garages from observation by lowering the door and locking it, the same cannot be said about the area in front of the garages.  As previously stated, that area was exposed and open to all residents of the apartment complex.

Weighing all of the *Dunn* factors, the Court concludes that the area in front of Haldorson's garages was not within the curtilage of his home.  The officers therefore did not trespass onto a constitutionally protected area to conduct the dog sniff, which means the case is not governed by *Jardines*.

The Court must also evaluate whether Haldorson's Fourth Amendment rights were violated under the second approach to consideration of Fourth Amendment rights. This approach "focuse[s] on whether the person challenging the search had a reasonable expectation of privacy in the location that was searched."  *Id.* at 899.  In deciding this issue, the Court looks to the Seventh Circuit's decision in *United States v. Whitaker*, 820 F.3d 849 (7th Cir. 2016), which held that the use of a police dog to search the shared hallway outside the defendant's apartment invaded the defendant's

18

reasonable expectation of privacy. The Seventh Circuit noted the Supreme Court's holding in *Kyllo v. United States*, 533 U.S. 27 (2001), in which the Court stated that where "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Whitaker*, 820 F.3d at 853 (citing *Kyllo*, 533 U.S. at 40). Because it concluded that a drug-sniffing dog "is a sophisticated sensing device not available to the general public," the Seventh Circuit held that the reasoning of *Kyllo* applied to the warrantless dog search of the defendant's apartment. *Id.*

Haldorson's case is not like Whitaker's, however. The search here was of a storage garage located in the common parking lot of an apartment complex, whereas the search in *Whitaker* was of the defendant's home. This is a crucial distinction. *See id.* ("Indeed, the fact that this was a search of a home distinguishes this case from dog sniffs in public places . . . ."). The Supreme Court has previously held that dog sniffs in public places do not constitute searches. *See, e.g.*, *United States v. Place*, 462 U.S. 696, 698 (1983) (sniff of a luggage at an airport); *Illinois v. Caballes*, 543 U.S. 405, 406 (2005) (sniff of a car on the street). The accessibility of the area where the dog sniff search was conducted in Haldorson's case makes it more akin to a sniff of a car on the street or luggage at an airport than a dog sniff of an apartment.

For these reasons, a motion to suppress the evidence obtained via the garage search had no reasonable possibility of success. Because the proposed motion would not have been meritorious, Haldorson's counsel did not render ineffective assistance by failing to file such a motion. *See Stewart*, 388 F.3d at 1084 (holding that defense

19

counsel was not ineffective because the proposed motion would not have been meritorious).

E.     **Ground 5**

Haldorson argues that his attorneys were ineffective in failing to move to suppress the cellular evidence used against him for a variety of reasons.  For example, he contends that his attorneys should have challenged the evidence on the basis that his phone was tampered with, the officers did not include expert affidavits in their search warrant application, the officers had searched the phone before the search warrant hearing, and there was false information in the warrant application.

The Court overrules these claims because Haldorson has not met his burden of showing prejudice from the introduction of the cellular data.  Haldorson asserts that the text messages obtained from the phone "were the main pieces of evidence the government relied on to obtain a conviction on Count 1 and 3 of the Indictment."  Sec. 2255 Mot. at 99.  But a review of the evidence at trial shows the opposite to be the case.  Regarding count 1, the government introduced the recording of Haldorson selling cocaine to the CI, testimony regarding the surveillance of the transaction by law enforcement, and the cocaine recovered from the CI after the transaction.  That was more than sufficient to convict Haldorson of the charge.  There was no reasonable probability that exclusion of the text messages accompanying the transaction would have changed the outcome of the case.  With respect to count 3, Haldorson cannot establish the required prejudice, because the Court dismissed that count after trial as a lesser-included offense of count 2.

20

**F.      Ground 6**

Haldorson argues that his right to counsel was violated because his attorneys failed to investigate Insley's testimony and impeach him.  Specifically, he contends that his attorneys should have used three reports that he later received through a FOIA request to impeach Insley's testimony in various ways.

Haldorson has not established that his attorneys were deficient in investigating and cross-examining Insley.  Although his trial attorney, Francis Lipuma, did not question Insley about the specific reports that Haldorson references, Lipuma did investigate and impeach Insley on numerous other points.  For example, Lipuma established via cross-examination that Insley withheld the arrest of the CI from other members of Haldorson's case; failed to document the arrest in writing; misrepresented the CI as a paid informant when he was actually trying to "work off" criminal cases of his own; failed to take notes regarding his investigation into Haldorson prior to his arrest; used the wrong informant number in reports; backdated reports; and misplaced Haldorson's phone for several days.  The additional points that Haldorson now cites would have been cumulative at best.  For these reasons, the Court finds that Lipuma was not deficient in investigating or cross-examining Insley.  *See United States v. Harris*, 394 F.3d 543, 556 (7th Cir. 2005) (holding that the defendant's attorney was not deficient where he had already impeached the witness effectively on other issues).  And even if so, for the same reasons, the additional cross-examination that Haldorson posits does not create a reasonable probability that the outcome of the case would have been different.

G.      **Ground 7**

In Haldorson's next claim, he alleges a violation of his right to testify.  He

contends that Lipuma (1) coerced him into waiving his right to testify and (2) gave him

erroneous advice concerning his decision not to testify.  Had he testified, Haldorson

contends, his testimony which would have resulted in his acquittal on the convicted

counts.

The Court concludes that Haldorson has not shown that he was prejudiced by

the absence of his testimony.  Haldorson contends that it was important for him testify

for two reasons:  (1) "law enforcement misreported the entire context of their

conversations about explosives with Haldorson," and (2) "the Government insinuated

that Haldorson wasn't honest about living with Allyson Figas, but had instead lied and

said he was living with his parents in Joliet."  Sec. 2255 Mot. at 106.  This testimony

would not have had any impact on the outcome of the case.  As the Court has

explained, testimony about Haldorson's explosives/fireworks hobby would not have

made a difference on the explosive charge on which he was convicted.  Specifically, the

basis for Haldorson's conviction was the recovery of items with smokeless powder.

Haldorson offers nothing to suggest that he would have testified about anything that

would have affected this.  Further, there is no basis to believe that the jury's decision

was based in any way on the proposition that he had lied about living with his parents in

Joliet.

Because the Court concludes that Haldorson was not prejudiced by his not

testifying, it need not adjudicate his contentions that his attorneys threatened him into

waiving his right to testify and erroneously advised him not to testify.  *See Rodriguez*,

22

286 F.3d at 985 (holding that "even if counsel did err" in advising the defendant not to testify, his section 2255 claim fails because he did not show prejudice from this deficiency). The Court notes, however, that there is an element of inconsistency between these two claims: is Haldorson contending that did not testify because he got bad advice, or because he got coerced? That aside, on the coercion issue it is worth noting that Haldorson's current contentions fly in the face of his statements to the Court at trial, immediately after the incident he references:

> THE DEFENDANT: I'm not going to testify.
>
> THE COURT: All right. And this is your decision, right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Nobody has told you you can't testify?
>
> THE DEFENDANT: No.
>
> THE COURT: Nobody is preventing you from testifying?
>
> THE DEFENDANT: No.
>
> THE COURT: Nobody's threatened you or anything like that?
>
> THE DEFENDANT: No.
>
> THE COURT: Okay. All right. And so this is your own decision made of your own free will; is that right?
>
> THE DEFENDANT: Yes.

Trial Tr. at 998. Now Haldorson is saying the opposite: he *was* threatened, he *was* told that he could not testify, and he *did not* make a decision of his own free will.

Statements made in court "carry a strong presumption of veracity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Although a defendant's prior waiver can be overcome

with "some form of substantiation, such as an affidavit from their lawyer," *Miranda v. Chandler*, 405 F. App'x 52, 53–54 (7th Cir. 2010), the Court does not determine whether Haldorson's attached affidavits are sufficient to meet this burden. Because Haldorson was not prejudiced by his decision not to testify, it denies the claim on that basis alone.

## H.     Ground 8

Haldorson argues that his due process rights were violated because the government violated the so-called "silver platter" doctrine, which prohibits the shuttling of prosecutions between state and federal governments to avoid the taint of illegality that is present in one system but not the other. *Elkins v. United States*, 364 U.S. 206 (1960). Specifically, he contends that the state officials investigating his case turned the case over to federal officials in an attempt to circumvent their violations of the Illinois eavesdropping statute. Additionally, he argues that his attorneys were ineffective for failing to make this argument.

Haldorson's arguments fail because the silver platter doctrine applies only when the alleged illegality is a federal constitutional violation. *See United States v. Cozzi*, 613 F.3d 725, 733 (7th Cir. 2010). As previously explained, the violation of Illinois's eavesdropping statute is not a constitutional violation, so there is no legitimate silver-platter issue in this case. And for the same reason, it was not ineffective assistance of counsel for Haldorson's attorneys to not make the argument.

## I.     Ground 9

Haldorson argues that the Fifth Amendment prohibition against double jeopardy was violated when he was prosecuted after his assets were punitively seized in civil litigation. He also argues that his attorneys were ineffective for failing to make this

argument.

The relevant question is whether civil forfeiture constitutes criminal punishment for purposes of the Fifth Amendment double jeopardy prohibition. The Supreme Court says no. In *United States v. Ursery*, 518 U.S. 267, 292 (1996), the Supreme Court held that prosecution following the seizure of money and property in a civil forfeiture proceeding does not violate the Fifth Amendment. Haldorson cites *Dye v. Frank*, 355 F.3d 1102 (7th Cir. 2004), for support, but that case involved a punitive tax rather than civil asset forfeiture, so it is not applicable.

Because Haldorson did not have a viable double jeopardy argument, it was not ineffective assistance of counsel for Haldorson's attorneys to not assert it.

**J.      Ground 10**

Haldorson argues that his rights under the Confrontation Clause were violated because he was unable to cross-examine the CI. As with the previous two claims, he also argues that his attorneys were ineffective for failing to make this argument.

Haldorson did not have the right to confront the CI because the CI's statements were not offered for their truth at trial. In its instructions to the jury, the Court stated that the CI's statements could only be used to provide context for other testimony and could not be used to prove the truth of the matters asserted in the statements. Specifically, the Court stated: "You heard statements on the recorded conversation of an individual identified as the informant. You may not consider his statements for the truth of the matters asserted in those statements. You may consider his statements to provide context for statements made by others during the recorded conversation." CR dkt. no. 331 at 11.

25

Seventh Circuit precedent establishes that there is no violation of the right of confrontation if a non-testifying declarant's statements are not admitted for the truth of the matters asserted in the statements. *See, e.g.*, *United States v. Jackson*, 940 F.3d 347, 352 (7th Cir. 2019); *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011). The case Haldorson cites, *Jones v. Basinger*, 635 F.3d 1030 (7th Cir. 2011), is inapplicable because, in *Jones*, the police officers extensively testified regarding the CI's statements, and the statements were offered for their truth.

## K.     Ground 11

Haldorson contends that his attorneys were ineffective because they should have moved to suppress the evidence from the computers seized from his apartment. He correctly points out that the search warrants for the apartment did not authorize the officers to seize the computers. CR dkt. no. 247-1 at 2. The government refers the Court to a July 2 warrant authorizing a search of the computers, but this warrant was issued after the June 24 seizure of the computers and thus could not have retroactively authorized the seizure. CR dkt. no. 247-2 at 3.

That said, Haldorson cannot establish that his attorneys performed deficiently because they *did* move to suppress the computer evidence. *See* CR dkt. no. 244. Additionally, Haldorson cannot meet the prejudice requirement because the evidence obtained from the computer related only to the gun charge, and he was not convicted of the gun charge. Haldorson argues that he was nevertheless prejudiced because the government would likely have dismissed the gun charge prior to trial if the computer evidence had been suppressed. If this had happened, he contends, he would not have had to stipulate to having been convicted of a felony and create "spill-over prejudice"

26

against him on the other charges.  Sec. 2255 Mot. at 123.  Haldorson's argument is unpersuasive because, in the jury instructions, the Court informed the jury that it could only consider the prior conviction evidence in connection with the felon-in-possession charge and that it could not consider the evidence "for any other purpose at all."  CR dkt. no. 331 at 12.  Under Seventh Circuit law, courts presume that juries follow instructions, *Perry*, 308 F.3d at 690, and in this case, there is no basis to believe that the jury did not do so.

## L.    Cumulative effect

Haldorson's final argument is that, even if the errors of his attorneys were individually harmless, they were harmful when taken together.  To establish ineffective assistance of counsel under a cumulative-error analysis, the petitioner must show that "the multiple errors so infected the jury's deliberation that they denied [him] a fundamentally fair trial."  *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000).  Haldorson does not meet this burden.  The Court previously determined that Haldorson's attorneys did not perform deficiently with respect to claims 3, 4, 6, 8, 9, and 10.  Even assuming that his attorneys were deficient with respect to each and every one of his remaining claims, the outcome of the trial would not have been different.

The majority of the claimed deficiencies relate to evidence concerning Haldorson's fireworks hobby or the gun charge on which he was acquitted—for example, his own proposed testimony, the proposed testimony of people who had seen his fireworks shows, the proposed testimony of the owner of the gun, the proposed testimony of the pyrotechnics expert, and the evidence from his computers.  None of that would have affected the outcome in any way, shape, or form, even in the

aggregate, for the reasons the Court has discussed. Some of the other claimed deficiencies relate to evidence that would not have been admissible at trial in any event (for example, testimony from Andrea D'Andrea). And further, some of the claimed deficiencies relate to evidence the probative value of which Haldorson has not explained (for example, the proposed testimony from the police procedure expert and the cellular data extraction expert).

Only the proposed testimony from Haldorson's father, the text messages from Haldorson's cell phone, and his proposed testimony about the officer's misrepresentation of his father's statement have any conceivable probative value regarding the charges on which Haldorson was convicted. But there is no reasonable probability that, but for his attorneys' alleged errors, the outcome of the trial would have been different. As previously explained, the testimony from his father and his own testimony about the officers' misrepresentations were, at best, minimally probative on the charges on which he was convicted, and this testimony largely would have been duplicative of Haldorson's other attempts to impeach the officers' testimony. And given the other evidence of Haldorson's drug transaction with the CI, the exclusion of the text messages would not have made a difference in the outcome of the case.

### Conclusion

For the foregoing reasons, the Court denies Michael Haldorson's section 2255 motion [1] [6] [13] and directs the Clerk to enter judgment denying the motion. The Court declines to issue a certificate of appealability because it can find nothing to suggest that the merits of the claims that it rejected are debatable, capable of different resolution, or deserving of further consideration. *See* 28 U.S.C. §2253(c)(2); *Barefoot v.*

*Estelle*, 463 U.S. 880, 893 n.4 (1983); *Porter v. Gramley*, 121 F.3d 1308, 1312 (7th Cir. 1997).

_____

MATTHEW F. KENNELLY
United States District Judge

Date:  April 12, 2022